# Duquesne Bank's Appeal.

1. Brady lent on bond and mortgage usuriously, he sold and assigned to a bank. *Held,* that the bank stood in no better position than he, as the securities were not negotiable.

2. The bank having knowledge of the usury or of facts to put them on inquiry, the debtor was not estopped by certificates of "no defence," given by him to Brady when the loan was made and produced to the bank when the securities were sold.

3. The securities were for $40,000 payable with interest annually in eight years and collectible after default of payment of interest for sixty days. The court ordered the bank to reduce the securities and their liens to the amount lent, $28,800, and restrained the bank from collecting any portion till the reduction was made.

4. Under the Act of May 28th 1858, usury is both illegal and contrary to equity; and the law should be maintained by all courts.

November 17th 1873. Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the Court of Common Pleas of *Washington county:* In Equity. No. 10 of October and November Term 1873.

On the 21st of September 1871, William White, assignee by several assignments for the benefit of creditors of Samuel Cowen, John D. Cowen and William H. Cowen, filed a bill against James T. Brady and the Duquesne Savings Bank. The bill set out:—

2 and 3. About September 20th 1870, Samuel, John D., William H. and S. C. Cowen negotiated a loan with Brady, and on that day gave him a joint judgment-obligation, conditioned for the payment of $40,000 in eight years, with interest payable annually, the principal to become due in default of payment of interest for sixty days after it was payable. Judgment was entered on the obligation in the Court of Common Pleas of Washington county to December Term 1870. For the further protection of the loan, and to designate the liability of each of the Cowens, they gave to Brady a judgment-obligation and a mortgage on separate tracts of land owned by them respectively: Samuel Cowen's obligation was for $10,000, John Cowen's for $12,000, William Cowen's for $9000 and S. C. Cowen's for $9000—making in the whole $40,000. Samuel received from Brady but $7200, John but $8640, William but $6480 and S. C. $6480—making in the whole $28,800.

[Duquesne Bank's Appeal.]

4 and 5. These securities were transferred, on the 4th of February 1871, to the Duquesne Savings Bank, without the knowledge of the debtors and without any inquiry having been made of them; and at the time of the negotiation of the loan and of the execution of the securities, Brady was President of the Duquesne Savings Bank, David Campbell was treasurer and S. C. Fetterman was a director. During the negotiations Brady advised with Campbell and Fetterman, and secured the loan for the bank.

6. The assignments for the benefit of creditors were made by the Cowens on the 13th of July 1871. The plaintiff averred that the loan was usurious, and was made by Brady for the use of the bank; and the assigned estates should not be charged with more than had actually been received by the four Cowens.

The prayers were:—

1. For discovery by the defendants and Campbell and Fetterman.

2. That the bank be restrained from proceeding on the mortgages and judgments until such reasonable time as the court might fix, and that the forfeiture be not enforced until that time.

3. That the joint judgment be reduced to $28,800, payable September 20th 1878, and bearing annual interest from September 20th 1870.

4, 5, 6. That the judgments of the three Cowens be reduced respectively to $7200, $8640, $6480, payable September 20th 1878, and bearing interest from September 20th 1870.

7. That the bank be restrained from collecting any part of the judgments until they had reduced their liens to the amounts above indicated, and that the bank be ordered to make the reduction.

8. Further relief.

The bank answered, admitting paragraphs 1 and 2, and denying knowledge of the allegations of paragraphs 3 and 6.

4. The securities were assigned to the bank October 17th 1870, by endorsement on them, and entered on the records of Washington February 4th 1871. Before the assignment, certificates of the four Cowens were produced, setting forth that they had no defence to the payment when the money should be due.

5. Denied knowledge of the time of negotiating the loan with Brady; admitted that Brady had been president of the bank and Campbell the treasurer ever since its organization; denied that Fetterman had been a director until January 10th 1871, and that Brady, during the negotiation of the loan, had advised with the treasurer or any director of the bank, or that he had obtained the loan for the bank.

7, 8. The bank was incorporated April 21st 1870, and was empowered to invest in bonds, mortgages, &c. All loans and investments must be approved by the board of directors or an investing committee, consisting of three directors.

9, 10, 11. The securities of the Cowens were offered for sale to the bank in October 1870, as other securities of like character were constantly offered. On the 10th of October they were submitted to a full board, who agreed to purchase them, if well secured and the terms of sale satisfactory. On the 17th of October they were bought by the bank for $30,690, and were transferred as before stated. They were purchased from James T. Brady & Co., in the usual course of business. They were not negotiated by Brady for the bank, and there was no agreement with him, express or implied, at the time of the negotiation, by which the defendant was to purchase the securities. They were purchased in good faith, as above stated, and the sum of $30,690 paid by the bank for them. The answer was signed and sworn to by Campbell, the treasurer.

Brady answered, admitting and denying substantially as in the answer of the bank. He further answered, that at the time the loan was made, he was one of the firm of James T. Brady & Co., bankers in Pittsburg; that about September 1st 1870 he was applied to by the Cowens, through their broker, George B. Hill, for a loan, and agreed to let Hill have it at $9\frac{1}{2}$ per cent. per annum, the excess to cover Hill's commission and other expenses about it; James T. Brady & Co. dealt largely in such securities; Brady informed the Cowens, at the time of making the loan, that he intended to sell the securities; "on or about the time they had drawn all the money coming to them thereon, they severally voluntarily gave said firm certificates setting forth that they had executed said securities, and that they had no defence to the payment thereof, when the same should become due and payable; which certificates bear date September 28th 1870."

After consummating the loan, he offered the securities to the bank; and the board of directors, after discussing the matter at several meetings, agreed to purchase them, and paid the firm of James T. Brady & Co. $30,690 for them; although president, he had no vote on the subject.

He denied that the loan was usurious, and averred that the "bank was nothing more than the purchaser of the securities while they were in the market." The profit realized by James T. Brady & Co. out of the loan, after paying $902.18 for commissions to Hill and other expenses, was about $1000 for their time and trouble in handling said securities.

Mr. Fetterman answered, denying that he was a director of the bank at the negotiation of the loan or the assignment of the securities; that all his connection with the transaction was as attorney at law to examine the title of the Cowens and prepare the securities, for which he was paid by Brady and the Cowens.

A replication was filed, and John L. Gow, Esq., was appointed examiner and master.

The certificates of "no defence," referred to in the answer, were in evidence before the examiner, and were in this form:—

"I, William H. Cowen, the obligor and mortgagor above named, do hereby certify and declare that I have no set-off or defence of any kind whatever, to the payment of the above bond and mortgage, and that the whole amount thereof is justly due and payable, as above stated. Witness my hand and seal, this 28th day of September, A. D. 1870.

"WM. H. COWEN. [SEAL.]"

The evidence before the examiner from both parties was that the amount of money received by the Cowens from Brady was as set out in the bill.

On the part of the plaintiff there was evidence that the commissions to Hill, the broker, had been paid by Brady without any agreement between Hill and them; also, that Campbell, the treasurer of the bank, had been present in Brady's banking-house during the negotiation for the loan, and made inquiries of J. D. Cowen in regard to the form of the securities, and that the Cowens never had any knowledge that the bank was about to purchase the securities.

For the defendants, Brady testified that he would not pay the money to the Cowens without certificates of "no defence;" that no one but his firm had anything to do with making the loan or advising about it. Campbell had been intimate at the office of the firm for many years, and frequently came in there; neither he as treasurer, nor Brady as president, had any power to negotiate loans for the bank.

"I offered these mortgages for sale to the Duquesne Bank. They were open to the best bidders. When they were offered to the Duquesne Bank, the matter was fully and elaborately discussed by the board, and as there was some hesitation on the part of some of the members of the propriety of the bank purchasing the mortgages, I stated to them that I did not care whether they took the mortgages or not. They finally agreed to purchase, at three per cent. per annum, discount off, allowing James T. Brady & Co. for the use of the money while they held the mortgages; the price paid by the bank to us being the sum of $30,690. James T. Brady & Co. made as profits $607.18, the additional interest being paid us, making our total profit about $1000. The bank voted to buy the mortgages. As president of the bank I had no vote in the matter. James T. Brady & Co. paid the attorney's expenses for examining title, and the commission to Geo. B. Hill. Mr. C. S. Fetterman had nothing whatever to do with the matter, except to examine the title and to see that the papers were executed properly. * * * No money of the Duquesne Savings Bank was used in the negotiation for these mortgages. These mortgages

were not taken by James T. Brady & Co. for the use of or in trust for the Duquesne Savings Bank or any other bank. The Duquesne Savings Bank was not concerned or connected in any manner or form in the negotiation and acceptance of the mortgage, nor was any other bank. We, James T. Brady & Co., took the risk ourselves. * * * The style of our firm is James T. Brady & Co., composed of James T. Brady and Calvin Adams. * * * He is not in any way concerned in the Duquesne Bank.

"Mr. Adams, my partner, is a resident of this city. He does not take an active part in our business; puts it all on me, unless I send for him specially. He sometimes comes in. Unless some matter of unusual importance comes up, he leaves everything to me. He does not consult with me in buying bonds and mortgages. Don't know that I ever said a word to him in regard to this transaction. Interest was allowed the Cowens—$72.09 on the bulk of the account. I find by an examination of the books, that on the day prior to receiving the certificates, there is charged to John D. Cowen $12,987.22; this of date 29th September 1870."

Campbell testified: "The only conversation I ever had with Mr. Cowen was when I incidentally went into the banking-house of James T. Brady & Co., and was introduced by Mr. Brady to Mr. Cowen, and was asked the question as to the probable value of land in Washington county. I answered the question by stating that in my judgment lands were worth from seventy to eighty dollars per acre. Mr. Cowen then commenced to open a conversation with me regarding a negotiation with James T. Brady & Co. I stopped him by saying that I had no connection with Mr. Brady's house, and did not desire to know anything in reference to his business negotiations. I did this because I thought Mr. Cowen was under the impression that I was connected with the banking-house. On the 17th day of October 1871, the mortgages, certificates of no defence and prothonotary's certificates were all before the bank. The assignment of the bond was made there. that day by Mr. Brady, for his bank, and the memoranda on the mortgages made by Mr. Brady, agreeing to have the mortgages assigned to the bank on the record of Washington county. Previous to the purchasing of these securities by the bank, I had no conversation or understanding with James T. Brady & Co., regarding their probable purchase by the bank; nor do I know of any director or other officer of the bank having any such understanding. * * * On the 10th day of October 1870, at a meeting of the board of directors, the treasurer, as is the custom, informed them that he had considerable funds to invest in proper securities, and as a large portion of the money was payments on the capital stock of the bank, it would not be checked against. He thought it advisable to make an investment in some long loan. Mr. James T. Brady then stated to the board that he had some mortgages which

had eight years to run, or nearly. He made a statement of the amounts respectively, and they aggregated $40,000. The matter of making so large an investment in a single transaction was fully discussed by the members of the board. Seven of the nine members were then present, one or two of the members offering objections to these particular securities because the lands securing the loan were situated in a county other than Allegheny county, Pa. But after a free discussion, their objections were withdrawn, and the board agreed to make the negotiation, provided the titles were good, and the terms satisfactory. These securities were taken precisely in the same form and the same manner that we now, and ever have, taken securities for the bank. * * * The bank had no knowledge of what James T. Brady & Co. made by the negotiation of these securities. Speaking about the bank I mean myself, for I presume no other member of the board would have any knowledge. These were not negotiated differently from all other securities taken by us. I know distinctly and positively that the securities were not taken by Mr. Brady in trust for the Duquesne Savings Bank, or for the bank. The connection of this bank with that of the firm of James T. Brady & Co. is of the same character as that held with our eastern correspondents, namely, that we keep a deposit account there, and check upon it regularly as we do with other banking institutions with which we have accounts; and James T. Brady, of the firm of James T. Brady & Co., has no more to do with this bank, than the other directors and stockholders have. * * * I don't think that any officer of the bank made inquiry of the Cowens as to whether they had any set-off or defence to the payment of these securities, because the bank had in their possession the certificates to that effect, signed by the Cowens respectively, and therefore took it for granted that they had no set-off to the payment of the same. To the best of my recollection and knowledge the bonds, mortgages, certificates of prothonotary, and certificates of no defence, were delivered into the custody of the bank at one and the same time, by Mr. Brady, or by some one for him."

Mr. Fetterman testified: "Mr. Cowen came to Pittsburg to make arrangements about drawing the balance of the money. James T. Brady wrote one check or order on their firm, and I wrote three for Mr. Cowen to take to the country to have his father and brothers and himself sign, in order to get the balance of the money, At the same time I wrote the four certificates of no defence, of which the papers attached hereto are copies, and gave them to John D. Cowen in presence of James T. Brady, in the banking-office of Brady & Co., and explained to him fully and carefully their object and what we wanted them for, telling him that in case Mr. Brady wanted to sell these securities, that whoever would wish to buy them, would require a certificate from the

parties executing the papers, setting forth that they had no defence to the payment of them, and that they could not be sold without their having those certificates, and that he had better have them signed at once by his brothers and father whilst the matter was going on, so that Mr. Brady would not have to go to the country or send to have them signed after having sold them. Mr. Cowen took the certificates with the checks or orders home with him and returned them in four or five days, signed by all the parties. The certificates were brought to me by Mr. Cowen, and I pronounced them properly signed, and gave them to Mr. Brady; and it was done while Mr. Brady held the bonds and mortgages in his own name." * * *

The master, in addition to the undisputed matters, found : that the delivery of the certificates by the Cowens was contemporaneous with the receipt of the money by them and was a condition precedent to the consummation of the loan; that the bank had no knowledge of the transaction before October 10th 1870. He decided that the transaction between Brady and the Cowens was usurious; and that the bank as assignee of the securities was in no better condition than Brady, unless it had taken the proper steps to protect itself.

He further reported :—

" No inquiry was made of the Cowens by the bank, at the time of the assignment of the securities, as to whether they had any defence to the whole or any part of the obligation, but it is claimed on the part of the bank that it is properly protected against any defence then existing, by the reception by them of the certificates of no defence, given by the debtors, notwithstanding the fact that they were executed and delivered at the time of the original transaction. The question then presents itself whether the certificates of no defence, given contemporaneously with the execution of a mortgage which is usurious, will avail in the hands of an assignee who makes no inquiry of the debtors of any kind, at the time of the assignment. Bonds are expressly made transferable by an Act of Assembly, and as such are an article of commerce. A man may bonâ fide purchase any security he can at the lowest possible price, and not be liable for the penalties of usury. But by the Act of Assembly the obligor is bound to pay only what is justly due at the date of the assignment, unless the obligee has protected himself by inquiry or notice. * * *

" The general rule is that the assignee takes subject to the equities of the assignor. The exception is, where inquiry is made and a defence precluded. Such conduct virtually makes a new contract. The original transaction being usurious, no act of the parties can affect its character as between themselves; to hold otherwise would render void the statute against usury. It is settled that any transaction, however artificial it may be, the effect of

[Duquesne Bank's Appeal.]

which would be an evasion of the statute, may be set aside in so far as it is usurious.   The certificates of no defence were entirely nugatory, so far as James T. Brady & Co. were concerned, had the obligors refused to pay its usury and gave no right to James T. Brady which was not already given by the mortgage.   Any right to enforce the usurious contract which the Duquesne Bank might have, cannot be claimed through James T. Brady & Co. The firm not possessing that right, have not assigned such a right to the bank.   To hold that the certificates protected the bank because of their new tradition by James T. Brady to the bank, he not having any right under them, would stamp the instruments with some of the characteristics of negotiable paper, which they do not and cannot possess.   The certificates, having been given by the Cowens to James T. Brady & Co., and by Brady transferred to the Duquesne Savings Bank, the bank has no better title than James T. Brady & Co. had.   They were not an *estoppel* in favor of Brady, and it cannot be claimed that by the assignment the assignee takes a better title than James T. Brady had himself. * * * The assignment of the certificates, therefore, if they are held to work an *estoppel*, operate with this effect on a new contract to which the Duquesne Bank and the debtors are the original parties. * * *

   " Is the bank a bonâ fide holder, without notice?   Mr. Brady, as president of the bank, was certainly bound by any notice he would receive of a matter affecting its interests.   He is a member of its board, and is one of its executive officers ; service upon him would be service upon the bank, and knowledge derived by him from any source, is knowledge by the bank under his care.   As a party to the original transaction, he had personal knowledge of the fact that the loan was usurious.   The fact that James T. Brady offered these securities to the Duquesne Bank a short time after they were given by the Cowens, for $30,690, was sufficient to have put the Duquesne Bank on its guard and inquiry.   The fact that James T. Brady presented to the bank certificates of no defence dating back to the original transaction, should have suggested the prudence of an investigation.   These circumstances were sufficient to put the bank on inquiry. * * *

   " This constructive notice the bank certainly had.   Positive information would have resulted from inquiry.   But in this case there was also direct notice to the corporation through James T. Brady, its president.   The management and government of the bank is effected by its president and board of directors, or by those specially authorized.   When a fact, gleaned from any source, is stated before the board by a member of it, and made a subject of conversation during the very transaction, it is impossible to doubt that the bank is to be affected, because knowledge of the fact material to be known is a part of the *res gesta*.   There cannot be a doubt, therefore, that knowledge imparted to the board by a

   24 P. F. Smith—28

director at a regular meeting is notice to the. bank. * * * When the mortgages were offered to the bank, the matter was fully and elaborately discussed by the board.   *   *   *   The fact that the securities were purchased at three per cent. per annum discount off, taken in connection with the fact that interest was allowed James T. Brady for the short period he held, would have afforded a ready means of ascertainment of facts from James T. Brady himself, and was constructive notice, even if no express notice was given to the bank by James T. Brady & Co., in its computation of the interest. But James T. Brady, when selling the securities for his own benefit, and being president of the bank, should be regarded as agent for the bank in his transactions with it, as well as for it; and as knowledge of the agent is knowledge of the principal, the Duquesne Bank should be regarded as having express notice. * * *

"Notice to the president or cashier, or other agent of the bank, is notice to the bank.   Had James T. Brady not been a party to the original transaction, but fully aware of its usurious nature, and of the fact that his bank was about to purchase, could it be claimed that the bank had not notice, or that his silence would not affect it?   That he occupied a position in the transaction which was adverse to the bank, cannot relieve it from the consequences of his silence, when the bank has confided to him, as its chief officer, the duty of protecting its interests.   As James T. Brady was president of the Duquesne Bank, knowledge by him of the usurious character of the securities was knowledge by the bank.   The bank is not therefore an innocent holder without notice. * * *

"But in case the Duquesne Bank had neither actual or constructive notice of equities, is there, by virtue of the certificates held by it, an *estoppel* against the debtors and in their favor? The Duquesne Bank having knowledge of and the relying upon certificates of no defence given to James T. Brady, claims that the debtors are thereby estopped from setting up any defence, or from making any prayer for relief by abatement of the amount of the mortgages, as against the bank.   The Cowens had no knowledge of the intention to transfer the securities to the Duquesne Bank, and it cannot therefore be claimed that the certificates were given for the purpose of influencing the bank to purchase.   Unless it can be shown that they wilfully misled the Duquesne Savings Bank in inducing the purchase, the certificates are not an *estoppel* in favor of the bank. * * *

"What would be the effect if certificates like those in question would work an *estoppel* in favor of an assignee?   Under the pressure of his creditors, or of circumstances which were impending, what will a man not do to relieve himself or get further respite?   While the negotiation is pending through which alone the relief can be had, the creditor is generally master of the situation, and can impose the hardest and most oppressive terms,

because the desperate circumstances of the debtor would either seem to make it prudent on the part of the lender, or the opportunity is afforded him, to profit by the borrower's necessities. If certificates could, as in this case, protect against the consequences of usurious transactions, the precaution is an easy one, and would soon become the rule among usurers. The statute of May 28th 1858 was designated for the relief and protection of that class of persons whose poverty is their destruction, and who are a prey to their necessities, and should be construed in such a way as to give effect to that intention. Judge Woodward, in 3 Wright 40, speaking of the statute for the recovery of usury, says that ' it is entitled to a liberal and beneficial construction, and should be held to encourage great prudence and thoroughness of investigation.'

" It is admitted that the certificates were a part of the original transaction ; were executed and delivered before the payment of the money, and were demanded as a condition upon which only the money could be obtained. They must be treated as if included in the mortgage ; and how could it be claimed that by such certificates, so inserted that a third party, by an assignment without inquiry, would be in any better position than his assignor to protect himself in a usurious contract ?

" Throughout this investigation, the statute of 1858 is continually staring us in the face ; and so long as it stands, its intention must not be defeated, unless the debtor chooses to give away his rights under it to an assignee in the clearest, most deliberate and voluntary manner.

" The master is of opinion, therefore, that the certificates of no defence are no estoppel in favor of the Duquesne Savings Bank, and that the amount due the said bank from the Cowens is the amount of money actually received by them on said securities, viz., $28,800, with interest, and a decree is suggested in accordance therewith."

Exceptions were filed by the defendants to the master's report. After argument, they were overruled and the report confirmed.

The court (Acheson, P. J.) decreed :—

" 1. The joint judgment be reduced to the sum of $28,800, payable September 20th 1878, and bearing annual interest from September 20th 1870.

" 2. The judgment against Samuel Cowen be reduced to $7200, payable September 20th 1878, with annual interest from September 20th 1870.

" 3. The judgment against John D. Cowen be reduced to the sum of $8640, payable September 20th 1878, with annual interest from September 20th 1870.

" 4. The judgment against W. H. Cowen be reduced to the sum

[Duquesne Bank's Appeal.]

of $6480, payable September 20th 1878, with interest from September 20th 1870.

" 5. That the Duquesne Savings Bank be restrained and enjoined from the collection of any portion of said judgments or mortgages until they have entered credits reducing the amounts of their liens to the sums above indicated, and an order of cancellation is hereby made to the extent of such reduction."

The defendants appealed to the Supreme Court, and assigned the decree for error.

*C. S. Fetterman* and *N. P. Fetterman*, for appellants.—Notice to the president was not notice to the bank. The cashier is the general executive officer to manage its concerns in all things not particularly committed to the directors by the charter, and he is the agent of the corporation, and not of the directors : Bissell *v.* First National Bank of Franklin, 19 P. F. Smith 419 ; Bank of the United States *v.* Davis, 2 Hill 451 ; National Bank *v.* Morton, 1 Id. 572 ; Ins. Co. of Md. *v.* Ins. Co. of Balt., 10 Maryland 517 ; U. States Ins. Co. *v.* Shriver, 3 Md. Ch. 381 ; Commercial Bank *v.* Cummings, 24 Pick. 270 ; Winchester *v.* Balt. & Susq. R. R., 4 Md. 231. A fair purchase may be made of a bond or note, even at a great discount, without incurring the penalties of usury: Musgrave *v.* Gibbs, 1 Dallas 217 ; Wycoff *v.* Loughead, 2 Id. 92. By delivering the certificates to Brady & Co., the Cowens enabled Brady to sell: and where two innocent persons must suffer, the one whose acts or admissions led to the injury, must bear the loss: Pickard *v.* Sears, 6 Ad. & Ell. 474. All the essentials of an estoppel are found in this case: Eldred *v.* Hazlett, 9 Casey 307 ; Herman on Estoppel, sect. 331: 323, 328, 333–342, 390, 459 ; Dalzell *v.* Odell, 3 Hill 219 ; Rudy *v.* Wenner, 16 S. & R. 18 ; Graff *v.* Pittsburg & Steubenville R. R., 7 Casey 489 ; Mitchell *v.* Reed, 9 Cal. 204 ; White Mount. Bank *v.* West, 46 Maine 15 ; Quick *v.* Thomas, 6 Mich. 76 ; Carey *v.* Clark, 13 La. 465 ; Scott *v.* Sadler, 2 P. F. Smith 211 ; Ashton's Appeal, 23 Id. 153 ; Chamberlain *v.* Townsend, 26 Barb. 611 ; Edgar *v.* Kline, 6 Barr 327.

*J. W. Donnan* (with whom was *D. S. Wilson*), for appellee.— The right to a reduction on account of excessive interest could not be waived by a contemporaneous instrument: Bosler *v.* Rheem, 22 P. F. Smith 54. Nor can a usurious contract be confirmed so as to make it available to the lender: Chamberlain *v.* McClurg, 8 W. & S. 31. When a fact is stated before the board by a member of it, and made a subject of conversation during the very transaction, the bank will be affected: Bank of Pittsburg *v.* Whitehead, 10 Watts 402. Notice to the president on any subject is notice to the bank: Morse on Banks and Banking 113 ; Porter *v.* Bank

of Rutland, 19 Vt. 410; Mechanics' Bank *v.* Schaumburg, 38 Mo. 228; Roumage *v.* Mechanics' Fire Ins. Co., 1 Green (N. J.) 110; Smith *v.* South Royalton Bank, 32 Vt. 341; Bank of U. States *v.* Davis, 2 Hill 451; North River Bank *v.* Aymar, 3 Id. 262; Louisiana State Bank *v.* Senecal, 13 Louisiana 525. When a person has sufficient information to lead him to a fact, he shall be deemed cognisant of it: 2 Kent Com. 630; May *v.* Chapman, 16 M. & W. 355; Maul *v.* Rider, 9 P. F. Smith 167. The assignee of a bond or mortgage takes it subject to all equities existing between the original parties: Rudy *v.* Wenner, 16 S. & R. 18; Weaver *v.* McCorkle, 14 Id. 304; Eldred *v.* Hazlett, 9 Casey 307. As to estoppel they cited Commonwealth *v.* Moltz, 10 Barr 527; Clark *v.* Sission, 22 N. Y. 312; Herman on Estoppel, sect. 445; 2 Smith's Leading Cases 750; Bigelow on Estoppel 484; Mechanics' Bank *v.* N. Y. & N. H. R. R., 13 N. Y. 638; Wilcox *v.* Howell, 44 Id. 403; Crawford *v.* Lockwood, 9 How. 547; Knettle *v.* Newcomb, 31 Barb. 169; Hutchens *v.* Hibbard, 3 N. Y. 24; Hepburn *v.* McDowell, 17 S. & R. 383; Crest *v.* Jack, 3 Watts 238; Hill *v.* Epley, 7 Casey 334; Alexander *v.* Kerr, 2 Rawle 83; Brubaker *v.* Okeson, 12 Casey 522. So long as the negotiation is incomplete, the borrower is the slave of the lender, and is bound to submit to the terms which oppression and his necessities impose upon him. The statute of May 28th 1858 was passed for the benefit of this class of persons, and should be so construed that no contract however framed would hold good, if the ultimate effect of it would be to secure more than the legal rate of interest: Fitzsimons *v.* Baum, 8 Wright 32; Evans *v.* Negley, 13 S. & R. 218; Greene *v.* Tyler, 3 Wright 361.

The opinion of the court was delivered, January 5th 1874, by

AGNEW, J.—The fact that the judgment and mortgages of the Cowens were usurious is proved beyond a doubt. The Cowens received from Brady & Co. but $28,800 for their judgment in the sum of $40,000, and mortgages to secure the same, due in eight years, with annual interest. The Duquesne Bank, as assignee of Brady & Co., stood in no better position than they, these securities not being negotiable. The bank, however, sets up certificates given by the Cowens to Brady & Co., a part of the machinery to enable them to effectuate the usury, declaring that they have no set-off or defence to the payment of the judgment and mortgages, and that the whole sum is justly due and payable. The bank alleges that the Cowens are estopped by the certificates from setting up the usury. The Cowens in reply prove that the bank itself paid but $30,690 to Brady & Co. for the debt of $40,000, and allege that it had notice of the fact of usury, and therefore has no equity.

[Duquesne Bank's Appeal.]

The master finds actual notice to the bank, or rather actual knowledge of the usury of Brady & Co. He finds this from a variety of circumstances: the relation of James Brady as president of the bank; the intimacy of Campbell, the treasurer, with the firm of Brady & Co., his frequent visits there; the practice of Brady & Co. in selling their claims to the bank, and the discount at which Brady sold this claim; the testimony of Brady that when the mortgages were offered by him to the bank, the matter was fully and elaborately discussed in the board of directors, and the hesitation on part of some of the members; his telling them he did not care whether they took the mortgages or not, and their final agreement to purchase at three per cent. per annum discount off, allowing Brady & Co. for the use of the money while they held the mortgages; the price paid by the bank to Brady & Co., $30,690; Brady & Co.'s profits, $607.18, and the additional interest paid them, making a profit of about $1000. These are significant facts, making it highly probable the bank knew that Brady & Co. had advanced on these securities a sum less by their profits than the sum paid by the bank. Looking at the relations between Brady and Brady & Co. and the bank, the discussions about the purchase, the difficulty among the members of the board, the amount of the securities, $40,000, the time the debt had to run, and the sum paid by the bank, $30,690, and allowing Brady & Co. for the use of the money while they held the securities, included in a calculation of the profits of Brady & Co., it cannot be believed that the bank supposed for a moment Brady & Co. had advanced to the Cowens the full $40,000. The master has found the knowledge of the bank, and the court has confirmed his finding. We cannot say there was plain mistake in this finding; indeed the probabilities are with it; and we must take the fact to be true that the bank knew of the sum paid to the Cowens by Brady & Co., and consequently knew of the usury. The defence is one under a statute which lays its hands upon the usury as an illegal act; contrary therefore to equity also; and it becomes the duty of all courts to maintain the law. The bank taking the securities with a knowledge of the usury, it cannot set up the certificates given to Brady & Co. as an estoppel. If by such a device the usury can be upheld, the law may be avoided in a most easy manner.

The decree of the Common Pleas is affirmed, with costs.